**CARPENTERS AND MILLWRIGHTS HEALTH BENEFIT TRUST FUND, Centennial State Carpenters Pension Trust Fund, Colorado Carpenters Vacation Trust Fund and Colorado Carpenters Joint Apprenticeship Trust Fund, Plaintiffs-Appellees,**

v.

**GARDINEER DRY WALLING CO., a Colorado Corporation, Defendant-Appellant.**

No. 76–1842.

United States Court of Appeals, Tenth Circuit.

Argued Dec. 14, 1977.

Decided April 10, 1978.

Robert S. Good, Denver, Colo., for defendant-appellant.

Pamela M. Martin, Denver, Colo. (John D. Thompson and Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., on brief), for plaintiffs-appellees.

Before McWILLIAMS, BARRETT and McKAY, Circuit Judges.

McKAY, Circuit Judge.

In this case the trial court held that Gardineer Dry Walling Company (Gardineer) must make contributions for certain of its employees to several employee benefit trust funds. The trustees' claims are based on three successive collective bargaining agreements between Gardineer and the carpenter's union and on trust instruments referred to in the collective bargaining agreements. Both the collective bargaining and the trust agreements were submitted jointly by the parties as evidence. Other evidence extrinsic to the collective bargaining agreements was introduced by Gardineer to support its interpretation.

Since Gardineer admits being bound by the collective bargaining agreements but disputes the trial court's interpretation of them, the central issue on appeal is whether the trial court's interpretation should be sustained. Our standard of review is the same as that expressed in *Palmer v. Howard*, 493 F.2d 830 (10th Cir. 1974). When, as here, extrinsic evidence is admitted to aid in the interpretation of a contract, the court's finding as to the contract's meaning "is . . . a matter of fact which is not to be set aside unless clearly erroneous." *Id.* at 835. Applying this standard, we affirm the trial court's judgment of liability, but remand for a recalculation of damages consistent with the stipulation of the parties.

Gardineer was involved in both residential and commercial construction work. The first of the three collective bargaining agreements (Building Agreement A) covered the period from July 1967 to June 1970. The Preamble to Building Agreement A provides:

THIS AGREEMENT is made and entered into this 1st day of July, 1967, A.D. by and between Gardineer Dry Walling Company . . . and Carpenters District Council of Denver and Vicinity . . . to govern the wages and conditions of employment of carpenters in the *Building Construction Industry* in the area hereinafter described, all within the State of Colorado. (emphasis added)

Article III states that the agreement "specifically applies to all of the work described" as follows:

The installation of all materials and component parts of all types of ceilings regardless of their materials, composition, or method or manner of their installation, attachment or connection. . . .

All work in connection with the installation, erection and/or application of all materials and component parts of walls and partitions regardless of their material composition or method or manner of their installation, attachment or connection. . . .

Under Article VII, dealing with wages, hours and overtime, separate subtitles appear for "housing" and "commercial building construction," outlining different terms for each category of project.

The second collective bargaining agreement (Building Agreement B) covered the period from January 1970 to April 1972 and the third collective bargaining agreement (Building Agreement C) was in effect from May 1972 to April 1975. Building Agreements B and C have Preamble and scope of work language similar to that in Building Agreement A. The only significant difference between Building Agreement A and the two later agreements is that Building Agreements B and C do not have subtitles under any of their articles distinguishing "housing" from "commercial building construction."

Gardineer admits that both its residential and commercial project employees were covered by Building Agreement A, but claims that only its commercial project employees were covered by Building Agreements B and C. To support this claim, Gardineer introduced two unsigned contracts respectively called "Carpenter's Housing Construction Agreement" (Housing Agreement 1), covering the period May 1969 to April 1972, and "Carpenter's Residential Construction Agreement" (Housing Agreement 2), intended as a replacement for Housing Agreement 1. Housing Agreement 1 provides that the agreement is meant "to govern the wages and conditions of employment of carpenters in the Housing Construction Industry in the area hereinafter described," and that the agreement "shall cover all work except that which is covered by the Building Construction Agreement . . . which [is] now in effect with the union." Housing Agreement 2 provides that the agreement "covers all residential construction in the State of Colorado."

The trial court admitted these unsigned contracts over appellees' parol evidence objection, although Gardineer had never signed either of these or similar, exclusively housing, agreements. Only two bits of evidence appear in the record that might explain the use or significance of these unsigned housing contracts. The first is testimony by a union official that such agreements were used "to cover employers in the residential market," with no elaboration of what was meant by "employers" or "residential market." The second is the confusing testimony of Gardineer's president, discussed below, concerning his subjective understanding of the coverage of Building Agreements B and C.

■ Gardineer first claims that the existence of Housing Agreements 1 and 2, coupled with the absence of specific reference to "housing" and "commercial building construction" in Building Agreements B and C, proves that in 1969 the building industry changed its practice of using one comprehensive labor agreement covering both types of construction to a practice of using two, mutually exclusive agreements covering respectively housing and commercial construction projects. Gardineer admits that the phrase "Building Construction Industry" (italicized in the Preamble language quoted *supra*) in Building Agreement A included both residential and commercial project employees, but claims that, when used in Building Agreements B and C, the phrase took on a new meaning which included only commercial and excluded residential project employees. Thus, because it never signed either of the housing agreements, Gardineer urges the court to infer that it is under no obligation to contribute to the trust funds for its residential employees.

We assume, without deciding, that Housing Agreements 1 and 2 were properly admitted. On the basis of these documents and the reasonable inferences that could be drawn therefrom, the trial court could have accepted Gardineer's interpretation of its contract with appellees. The trial court chose not to do so, and found instead:

The fact that the union may have entered into some collective bargaining agreements covering less than the entire "Building Construction Industry" (for example residential and housing construc-

tion only) is no logical or reasonable basis for construing the term "Building Construction Industry" used in all of the collective bargaining agreements to which defendant was a party, as not including residential and housing construction.

The conclusion of the trial court is not clearly erroneous but rather is consistent with the evidence. On its face, the operative language of all three collective bargaining agreements remains essentially the same. The term "Building Construction" appears in each of the agreements with no internal indication that its meaning is more limited in one agreement than in another. The general, apparently comprehensive description of the scope of work covered remains the same in all three agreements. Again, there is no internal indication that the coverage of both commercial and residential work categories in the first agreement was narrowed to include only commercial projects in the later two agreements. This evidence, standing by itself, would justify the court's adoption of the interpretation advanced by appellees that Building Agreements B and C, like Building Agreement A, cover residential as well as commercial project employees.

To support its contrary interpretation, Gardineer presented no evidence that it negotiated the coverage of Building Agreements B and C to be more limited than that agreed to in Building Agreement A. It might also be inferred from Gardineer's failure to sign separate residential agreements that the company intended to cover residential project employees under the two subsequent collective bargaining agreements just as it admittedly had done under Building Agreement A. Gardineer's introduction into evidence of Housing Agreements 1 and 2, without any testimony to show the extent of their use in the industry or the exclusivity of their coverage in the residential construction industry, is insufficient to compel the trial court's rejection of the trustees' interpretation that residential project employees are covered by Building Agreements B and C.

Although the testimony of Gardineer's president as to his understanding of the coverage of Building Agreements B and C is of questionable worth in deciding this issue, his testimony is in any event inconsistent with the argument advanced by Gardineer. The testimony of Gardineer's president at various points in the record suggests without clearly so stating that, because of the appearance of Housing Agreements 1 and 2, he understood that Building Agreements B and C only covered commercial project employees. Two factors leave room for the trial court to have significant doubt that this was in fact his contemporaneous understanding. First, the testimony of its president suggests that the union had used separate housing contracts "somewhere in the '60s" before 1969. If this is true, Gardineer cannot maintain that the appearance of Housing Agreement 1 in 1969 thereafter limited the general term "Building Construction Industry" only to commercial work, since the union was already using separate residential agreements during the life of Building Agreement A which admittedly applied to residential project employees. Second, Gardineer's past practices clearly indicate that it perceived a distinction not between residential and commercial project employees, but rather between union and non-union employees. Even though Building Agreement A applied to both residential and commercial project employees, Gardineer failed to make trust fund contributions for its regular residential project employees, almost all of whom were non-union workers. The company, however, consistently made contributions for its commercial project employees, all of whom were union members, even when they worked on residential projects.

The record establishes only that a separate residential construction agreement *exists* and *may* be used to cover residential project employees, not that its mere existence, unexecuted by Gardineer, limits the scope of its more general building construction agreement. Thus, in light of the all-inclusive terms of coverage of the Building Agreements, which apply to all phases of

dry wall construction work without distinction as to the type of project, the trial court justifiably could conclude that the Housing Agreements are in fact complementary to, not mutually exclusive of, the Building Agreements. Since Gardineer had not executed a Housing Agreement, it was not plainly erroneous for the trial court to find that the more general employee coverage provisions of Building Agreements 2 and 3 apply and that the company's residential, as well as commercial, project employees were covered by each of the Building Agreements.

■ Gardineer's next contention is that the trial court erred in finding "that Defendant's obligation to contribute to the trust is fixed by the collective bargaining agreement." Citing *Local 9, IUOE v. Siegrist Construction Co.*, 458 F.2d 1313 (10th Cir. 1972), Gardineer attempts to establish that it is *only* the language of the trust instrument itself that governs the employer's obligation to contribute to the trust fund. The court in *Siegrist* did not reach that conclusion, but rather only held that an employer's obligation to contribute to a trust fund may continue beyond the expiration of the collective bargaining agreement under which the obligation first arose. Here, as in *Siegrist*, the obligation to contribute to the trust funds arose upon the signing of collective bargaining agreements that made specific reference to the trust funds. None of the trust agreements specifically requires Gardineer to sign the trust instrument to become an obligated party. Instead, as a representative statement from one of the trust agreements provides, "[e]ach Employer not represented by any individual Association listed herein [including Gardineer] . . . shall agree in writing to be bound by the terms and provisions of this Amended Agreement and Declaration of Trust. . . ." Correspondingly, in each of several separate sections dealing with the various trust funds, language similar to the following appears in each of the Building Agreements: "Employer and the Union agree to be bound by and to comply fully with all terms and provisions of the aforesaid Trust Agree-

ment . . . together with any and all further amendments, changes and additions thereto which at any time may be adopted by said Board of Trustees." Thus, the requirement that Gardineer "agree in writing" to the terms of the trust agreements is satisfied by its signature on the Building Agreements. Gardineer apparently had no doubt as to the applicability of the trust agreements, at least as to its union employees. The specific amount of employer contributions required by the trust agreements is clearly spelled out in the Building Agreements. The company faithfully made contributions to the trust funds for union employees since entering into Building Agreement A with the union in 1967. We therefore agree with the trial court's determination that it was not necessary for Gardineer to specifically execute the trust agreements before being bound by them.

■ Gardineer next asserts that appellees have the duty to prove damages to the trusts before this court can order the company to contribute to the trust funds for its employees. Gardineer then offers a rather elaborate exposition of the impossibility or unlikelihood that its failure to make contributions has or will result in losses when claims are made against the trustees by the company's employees as trust beneficiaries. This argument assumes that Gardineer's contributions to the trust funds can only be used for the benefit of the company's employees. Such is not the case. The trust funds were established for the benefit of all employees of all employers that contribute to the funds. Once it is clearly established for whom the contributions should be made, Gardineer's obligation to contribute fully to the trust funds is unconditional. Thus, "[f]or breach of contract, compensatory damages should be such as will place the injured party in the same financial position in which he would have been, had the contract not been breached." *A to Z Rental, Inc. v. Wilson*, 413 F.2d 899, 908 (10th Cir. 1969). In this case, the amount of damages should be the sum of the contributions Gardineer should have made for all of its residential project employees during the period

in question, plus incidental damages as determined by the trial court.

■ Gardineer next maintains that the Health Benefit Trust Fund Agreement dated January 23, 1968, applied only to union employees and that, since the trustees did not communicate to Gardineer any subsequent amendment to the agreement broadening its scope to include non-union employees, the doctrine of laches or estoppel prevents the appellees from now claiming benefits for hours worked by Gardineer's non-union employees. The language in the trust agreement upon which Gardineer relies reads as follows:

> NOW, THEREFORE, in order to establish and maintain a Trust Fund to receive Employer contributions relating to all Employers and Unions heretofore identified in said Agreement and Declaration of Trust dated May 10, 1965, as well as to Employers currently being included as contributing Employers *and as to currently included Unions whose members are to be covered under the aforesaid Agreement and Declaration of Trust,* it is hereby mutually understood and agreed that said Agreement and Declaration of Trust dated May 10, 1965 shall be and hereby is amended and superseded henceforth to read and provide in its entirety as follows. . . .

One interpretation of the above language, taken in isolation, is indeed as Gardineer has suggested. However, in view of other language in the trust agreement and provisions in the Building Agreements, as well as recent case law, we think that the trial court was correct in finding that the Health Benefit Trust Agreement in question covered non-union as well as union members from its inception.

Article IV of the trust agreement provides that "[e]ach Employer shall pay to the Fund such amounts as are set forth in the Collective Bargaining Agreement." Building Agreements A and B each state that they "govern the wages and conditions of employment of carpenters in the Building Construction Industry." No mention is made distinguishing union from non-union carpenters. Building Agreement C is even clearer in its inclusion of non-union person-

nel, governing "all . . . terms and conditions of employment of the employees of the Employer." Since Gardineer employs both non-union as well as union members, both are covered by the agreements. This court, treating a similar issue in a recent case, held that an employer was obligated to make contributions to a trust fund for non-union employees who were undisputedly performing work covered by the collective bargaining agreement, despite a long-standing "union members only" contribution policy. *Manning v. Wiscombe,* 498 F.2d 1311 (10th Cir. 1974).

Gardineer finally, and correctly, maintains that the trial court erred in its assessment of damages to be awarded appellees. Despite a stipulation by both Gardineer and appellees that the trust funds have no claim for damages prior to January 4, 1968, due to the six-year statute of limitations, Colo. Rev.Stat. § 13–80–110 (1973), the trial court awarded damages accruing from July 1, 1967. The award should be reduced to correspond with the parties' stipulation.

The judgment of the lower court is affirmed with respect to all the merits. With respect to the amount of damages, the case is remanded to the trial court for a recalculation consistent with this opinion.